Case No. 19-2898 from the District of Southern Iowa. City of Council Bluffs et al. v. U.S. Dept. of the Interior et al. Mr. Lundquist. Thank you, Your Honor. May it please the Court, Ms. Sprague. My name is John Lundquist. I'm an Assistant Attorney General with the Iowa Department of Justice. I'm representing the plaintiffs, State of Iowa, State of Nebraska, and the City of Council Bluffs in today's arguments. Despite this case's long and protracted history, the question presented through this appeal today can be summed fairly simply. Does the Ponca Restoration Act establish geographic limitation on land acquisitions that can be considered taken into trust as part of the restoration of lands under the Indian Gaming Regulatory Act's so-called restored lands exception to its prohibition on gaming on lands acquired after its enactment date? As even I believe the defendants agree, the Court need not look any further than the language used in the Restoration Act to find the answer. Knox and Boyd County, Nebraska, are the only geographic areas specifically identified in the PRA as areas where the Secretary is to take land into trust for the benefit of the tribe. The tribe desires to game in Carter Lake, Iowa. That is not in Knox or Boyd County, Nebraska. The Department's own rules support this interpretation and should have been applied when considering the tribe's site-specific gaming ordinance. The grandfather clause, however, was unreasonably employed to achieve the result desired by the defendants. Mr. Lundquist, is there any degree of deference owed to the government's interpretation here? Interpretation of the Restoration Act or the grandfather? Well, the Restoration Act in particular in terms of considering it to include lands in Pottawamie as opposed to the two that are listed in the Act. I would say that given the fact that the statute I think is subject to interpretation using the normal tools of statutory construction to reach a plain meaning, that the question of deference doesn't need to be reached. To the extent that the court finds that the question, step two in the Chevron analysis needs to be analyzed, I would posit that given the inconsistent approaches that the government and the defendants have taken throughout this detracts from any deference that they should be granted in this matter. The bottom line is that they promulgated a regulation in which they purport to tell how these types of Restoration Acts should be interpreted within the scope of the Indian Gaming Regulatory Act, the section 292 rules that are cited throughout the briefing. These were in force in 2008 prior to this court's remand order when this was before us 10 years ago. The section 292.1 stated purpose is that these are procedures DIA will use to determine whether IGRA exemptions are applicable to acquired lands, including the restored lands. And so, what the government or the DOI has provided is that the legislation, if it requires or authorizes the secretary to take lands into trust for the benefit of the tribe within a specific geographic area, and the lands are within that specific area, according to their regulation, the 292.11, that's where these lands should fall. As mentioned earlier, the PRA expressly authorizes or requires the secretary to take lands into trust within both Knox and Boyd counties. Therefore, section 1 should govern here. And given the fact that they have determined what their viewpoint of the world is, their contrary view in this case, that the regulations are not applicable and therefore that geographic limitation can be ignored, I don't believe should be entitled to deference. I think the Supreme Court and others have found that if you're going to take inconsistent approaches throughout litigation and that you're doing so merely for convenience sake to get a good litigation position, then that deference should not be granted. In looking at the actual statutes here today, the enacting the Ponca Restoration Act, Congress did intend to limit trust acquisitions as part of the Ponca Tribes Restorations lands located in Boyd and Knox counties in Nebraska. To the extent that defendants in the district court found otherwise, that's error and this court should correct that. As you know, you start any statutory analysis with the first step of the Chevron analysis, which is has the Congress spoken directly to the precise question at issue. As I stated earlier, if there's a plain meaning to the statute, then that controls. And the court may employ traditional statutory tools of construction to assist it in finding whether or not there is a plain meaning. In this particular case, I think it was a mistake for the defendants to interpret the Ponca Restoration Act in isolation. That in fact, the Indian Gaming Regulatory Act does have relevance to this analysis and should have been taken into account and the two should have been considered together. After all, it's the state's challenge to this matter of a NIGC Gaming Ordinance approval under the IGRA that led to the judicial action that's before us under the APA. Now, as indicated in our briefing, Congress does legislate with an awareness and knowledge of pre-existing laws. And so IGRA, which was enacted two years prior to the Restoration Act, in this case in 1988, Congress would have been cognizant when it passed the PRA of the IGRA's gaming prohibition on after acquired lands and the restored lands exception. So therefore, Congress would have understood the significance of designating within the PRA certain lands or geographic areas where the land acquisitions would occur. As indicated already, Section 4 of the PRA mandates that the Secretary shall take not more than 1,500 acres into the trust within Boyd and Knox County, and the Secretary may accept additional acreage in those same counties. It's within the section entitled Restoration of Rights that this instruction appears, so I think it follows that if the lands are authorized or mandated to be taken into trust within a specific geographical area pursuant to these enumerated restoration of rights, then those lands alone should qualify as restored lands. And as I've already indicated, this is not just the plaintiff's position. This is also the Department of Interior's preferred interpretation as evidenced by Section 292.11 rules. So, Congress can choose to express its intent through many different means, and it can expressly limit where gaming can take place in certain instances, yet in this particular instance, because of the Ponca Restoration Act, Congress did not need to draft more specific restriction on gaming because IGRA already prohibits gaming on after acquired trust lands, not procured as part of a tribe's restoration. So, to the extent that the defendants and the government rely upon these pre-IGRA restoration acts to provide guidance as to how we should interpret the PRA, those, I think, provide limited assistance because they predate IGRA, so therefore the qualifying restored lands would not have had the same significance. There was no exemption to take into account, and geographic limitations necessarily would have been imposed for political or other reasons unrelated to application of the Gaming Act, which brings us also then to the second rule of statutory construction that bodes in favor of the state's position here, that being, and I always mispronounce this, expressio unis exclusio alteriates, which you all know means to express into one thing is to the exclusion of others, and because Boyden and Knox counties are expressly identified, all others are implicitly excluded. As we know, Carter Lake is in Pottawatomie County of Iowa. It is excluded under the act. In response to the government's argument that Section 3 and other provisions of the PRA should be read as expanding that zone of restored acts, I think it's important to note that the purpose of a restoration act is to return tribes to equal standing with those that weren't terminated by the federal government, basically restore that which they were stripped of. You know, like other tribes, the Ponca Restoration Act does make available that the Ponca shall benefit from all applicable federal laws, including the Indian Reorganization Act and IGRA, but IRA and IGRA, too, must be read in concert because non-terminated tribes acquiring land under IRA after October of 1988 are not eligible to game on those lands. They must go through this so-called two-part termination process. So, limiting restored lands to enumerated counties is not diminishing the Ponca's rights under IRA compared to those other non-terminated tribes. Nonetheless, the PRA does allow for the discretionary use of IRA within Knox and Boyden counties, and those lands arguably would be restored because they are within that same paragraph in those same geographic areas. So, IGRA restricts where gaming may take place, and it's long been recognized that not all lands obtained in trust under the Indian Reorganization Act would qualify as gaming eligible restored lands, that there has to be some limitation, and by defining that geographic area, that provides a reasonable basis for and the same can be said for the examination of service areas, because they don't expand the scope of restored lands, because IGRA speaks of lands. It doesn't speak of the restoration as part of restoration, excuse me, not service or economic area. Turning to the 292 regs, as I indicated, the Department of Interior has told us how they think these restoration acts should be applied. However, in this particular case, the agencies went out of their way to implement the Grandfather Clause to avoid applying those regulations, and in this particular case, they used both versions or parts of the Grandfather Clause, the first being that there was a final agency decision, and the second that there was an outstanding legal opinion from one of the agencies. Well, I would say there is no final agency decision. The 2007 decision was remanded for further consideration. It was incomplete. There was more judicial work to be done. That's why we're here today dealing with the 2017 decision that the court ordered the agencies to make. As far as Michael Gross's legal opinion, they claim that that triggered the Grandfather under subsection B, but Gross's opinion didn't trigger that because it was rejected and an alternative ruling was substituted by the NIGC in its place. Defendants claim both in their rulings and elsewhere that this opinion is still continuing in effect, but I would ask you, as to the numbers I know sat on this panel last time, although Judge Wolley's initial ruling on the prior judicial review was reversed, would you consider that to still be in effect? I would think not. Lastly, neither of the agencies or Mr. Gross's opinion addressed the question of whether or not the Ponca Restoration Act is guiding as to how we should apply the restored lands exclusion in IGRA. This is the first time that the agency has ruled upon that, and this is the first time the solicitor's opinion in 2012 addressed that long after implementation of the rules. Instead, both the district court granted deference under our to let the government decide how they feel that this so-called ambiguous grandfather should be applied, but I would have you look at the purposes for grandfather clauses such as this, that they allow for grandfathering so that those pre-existing restored lands determinations stand undisturbed, so we prevent undue hardship for those who relied, and also promote finality of agency decisions, neither of which those purposes are served here because this determination has been subject to repeated litigation. It's had numerous reversals and contrary findings, and the gross opinion initially was favorable to the state's position, so no one was negatively affected by any of these things. Instead, it would appear to me that the grandfather clause is being used in this instance as litigation convenience by the government, that in other cases where ambiguity in the grandfather was apparent, the agency applied both the common law Grand Traverse test and the agency regulations, but in those cases, they reached the same result, whereas here, a contrary result would be dictated, and so with that, I'll reserve the remainder of my time. I have a question if I may. Yes, Judge. It's on a different topic. Why is there a final decision of the district court here? It seems to me that the district court remanded the case to the agency for further analysis on restored lands. If the agency had decided these were not restored lands, there'd be no point to this appeal because the state would conclude that there are restored lands, then we're in a situation of potential piecemeal appeals where you have this appeal, and then you have a follow-on appeal about whether their restored lands analysis is correct, so query why there's a final decision. If you're citing the Sisseton case, please tell me what is the limiting principle on that and whether that's an outlier in the country on the definition of final decision. As far as the question of outlier, I cannot answer that, Your Honor, and we are relying upon Sisseton, and as you know, the government agrees that that jurisdiction is based on that. But the parties can't conspire to grant jurisdiction, so... I understand that, obviously, that the court decides for itself whether it has jurisdiction, and this particular instance, as you know from the record, the plaintiffs actually sought permission from the district court to certify an interlocutory appeal on the question that's now before you, and in dismissing or overruling that, the judge made a determination under the Sisseton factors that this was a final decision because the limited manner of the question that she remanded back to the government did not require a great deal of consideration or thought. In fact, the government had actually responded with a remand decision prior to the court even ruling on those motions, so the court felt that because the plaintiffs in this case got virtually none, if none, of the actual remedy we were seeking, that this case did fit into the Sisseton framework because there was just that tiny bit of reconsideration of those discretionary factors that were going on. Yeah, I understood that. I mean, I read her opinion, of course, and I understand that there's law that says if the case is sent back for what the courts have called ministerial functions, then the district court's order can be final, but it seemed to me that there's a real question here whether the ultimate decision on restored lands can be considered a ministerial matter. I don't hear you saying it's a ministerial question that was at issue on remand, you're just saying it was somehow limited. Yeah, she asked them to consider a factual circumstance that she felt your prior order required them to take into account that that overruled our request for regulatory relief, she overruled our request to find that the PRA was binding as to the restored lands question and the other matter, and quite frankly, at the end of the day, I think the PRA question is the true issue that will dictate whether or not there are restored lands at question in this matter. So even though the government can engage in endless tries to balance those factors correctly, if the Restoration Act limits only to Boyd or Knox County, then this court can finally dispose of this issue. All right. Thank you, Mr. Lundquist. Ms. Sprague? You're muted. Your mic is muted. I apologize, Your Honor. May it please the court, Mary Gabrielle Sprague for the federal defendants. We agree with the plaintiffs that this case can be decided at step one of the Chevron analysis, but we disagree as to the conclusion of that analysis. The Department of the Interior decided in a detailed and thorough opinion in March 2012 in response to this court's remand order that the Restoration Act does not restrict the land that potentially qualifies for IGRA's restored lands exception to Knox and Boyd Counties, Nebraska. This is in the appendix of 54 to 69. The National Indian Gaming Commission then incorporated that analysis into its November 2017 decision, and in concluding, furthermore, that the Carter Lake parcel is properly considered restored land on which the tribe may gain. The district court undertook its own statutory interpretation of the Restoration Act, and it reached the same conclusion as the agencies, and in a very brief statement, we think, as belt and suspenders said, if there was any question about that, we will defer to the agency's reasonable interpretation. We ask this court to affirm the district court based on Chevron step one. That, of course, So counsel, this is this is Judge Smith, so you agree with the appellant that just a plain reading of the act will lead us in the right direction? I do, your honor, meaning Chevron step one, applying the full array of the traditional tools of statutory construction, which mean, of course, text, but considering all the text read in context in the structure of the act as a whole, including the legislative history, the purposes of the statute, and it must be construed against the backdrop of other statutes, which, of course, include the Indian Reorganization Act and the Indian Gaming Regulatory Act, but also other Ponca Restoration, excuse me, other Restoration Act, of which there have been many through the years. What's your succinct statement for how to get around the limitation to two counties? It is that when you look at the statute as a whole, Congress intended the secretary to retain authority under the Indian Reorganization Act to take land into trust. When you look at where that land was expected to be taken into trust, you have section five, which defines a large service area of 15 counties where the Ponca people lived. Congress did not want to move the Ponca people back to the historic reservation in Boyd and Knox counties. They thought that would be a recipe for disaster. So they instead expressed clear intent to allow the Ponca people to remain living where they were living and to allow economic development to them. Again, the clear intent of the statute was that economic development would occur throughout those 15 county areas, which is within their aboriginal territory. That's an area that is not completely included all the counties, but from north to south. That plan was developed, which does include the need for economic development, which required taking land into trust throughout different parts of the service area. That plan was submitted back to Congress in 2000, and Congress did not disapprove it. So that when you look at sections three, five, and 10 together and understand the overall structure, also the legislative history reveals that the reason why the tribe was insisting on a mandatory acquisition in Boyd and Knox counties is that they wanted to establish their cultural center, a community gathering place that was not identified as the core of their economic development that would carry the tribe forward under its current circumstances. But there was a very specific desire for that land in their historic reservation area, and that is in fact how the tribe has used that land. They do have a cultural center there. They have a buffalo herd there. That is where they have their annual powwow. The community does gather there, but that was not Congress's intent to limit economic development opportunities. You also, and you of course have to interpret IGRA, but it's highly relevant that the purpose of IGRA, which was to promote economic development and self-sufficiency for tribes, is the same purpose as in the Ponca Restoration Act. So there is no reason why if Congress had focused on gaming in particular, which it's not clear that it did, that it would have reached the conclusion, I would like any gaming to occur in Boyd and Knox counties. There is no reference to gaming in the Ponca Restoration Act. There's no specific reference to the Indian Gaming Regulatory Act, although we agree that the tribe was made, it was made applicable to the tribe under Section 3. The tribe has a few relatively limited arguments. They elevate Section 4 above the other sections because of its title Restoration of Rights. And so they say because the mandatory acquisition language is in Section 4 called Restoration of Rights, that suggests that the Congress meant that this would be the restored land. Congress of course, well let me point out, the entire statute is called the Ponca Restoration Act. So one would think that restoration restored land status could come from any provision and of course the entire statute must be read as a whole. But also when you look at the evolution of that provision, Section 4, as Interior carefully did, the title came before there was any reference to Knox and Boyd counties. The original bill would have allowed or would have required Interior to take land into trust wherever the tribe offered a parcel. And the Department of the Interior said, well that's very broad. We don't think we should be required to take any land that's offered to us. So the restriction, the mandatory acquisition was then restricted to Boyd and Knox counties up to 1,500 acres. But that came later. And so I mean, I've looked through many of these restoration acts and they have many of the same pieces, but they rearrange them differently. And some of them have the same headings, but text under this heading is different. In this statute, the mandatory idea was put under the added to that later. Other statutes have similar provisions under other captioned headings. You need to look at the statute as a whole, not just the caption. And in this regard, there are two other restoration acts that Interior found particularly informative because they had similar mandated acquisitions and then discretionary acquisitions. The first statute is the 1984 Hoos, Lower Umpqua, and Seuss Law Restoration Act that was addressed in Oregon versus Norton, District of Oregon, 2003. And there Congress mandated the acquisition of four specific parcels, but the court held that yes, those mandated parcels qualified for the restored lands exception, but that was not a limitation. For other parcels, we have to apply the fact-based test and it went on to do so. Similarly, City of Roseville versus Norton, the D.C. Circuit's decision in 2003, that interpreted the Auburn Indian Restoration Act of 1994. That act had three different provisions. One had mandated acquisition for the land within that tribe's historic reservation. There was a second provision that said the secretary may take land into trust in a specific county, and then there was a third provision that said the secretary may take land into trust throughout that service area. I believe that was a five-county service area in Central California, and the D.C. Circuit looked at that and they rejected the notion that restored lands was limited to the parcels, the mandated parcels within the tribe's historic reservation. And it parsed the specific language of that statute, but importantly, it looked at the statute as a whole and it looked to the purpose of that restoration act, which is the same purpose as the other restoration act, which is to remedy the effect of the termination era of the 1950s when the government-to-government relationship with these I want to point out that this is not a limitless check to the Ponca tribe to continue opening additional casinos. Future applications to take land into trust for gaming would be subject to the 2008 regulations, and at this point, we're 30 years out from the 1990 restoration act, and under the temporal connection factor, the tribe would not have that right. So this is the one parcel that would plaintiffs make limited arguments against interiors analysis, which the district court found on its own analysis to be correct. The expressius unius maxim, I would like to make two points as to that. That maxim has no applicability here because there's no direct linkage between a So if the statute had said that lands acquired for the Ponca tribe will only be considered restored if located in Knox and Boyd counties, that would be one thing, but the statute doesn't say that. If it just said something more general, like lands acquired in Knox and Boyd counties shall be considered restored, then the maxim at least would have some relevance, but you would still have to ask in context, well, does Congress mean that lands outside Knox and Boyd county aren't restored, or does it just mean that for Knox and Boyd county lands, we don't have to go through that factual analysis. We just know the answer in advance. But in the present context, in the way in which Knox and Boyd counties were utilized, that maximum does not lead to the conclusion that they suggest. I want to discuss the Chevron deference. We don't think that it's necessary to get into the nuances of the deference principles. We certainly think that the decisions are correct. If the court has some question about the step one statutory analysis, then we do ask for deference. This was intended to be a binding interpretation of law. It was rendered in response to this court's direction to answer this question as to whether the Ponca tribe can legally gain on this land. And there has been no inconsistency on the Ponca Restoration Act. There was back and forth before this court rendered its 2010 decision about whether this act. The concern was about the purported agreement between the tribal attorney and the Iowa attorney general's office and how that factored into the analysis. But 2012 was the first time that there was a detailed analysis of how the Ponca Restoration Act applies, and that is now before this court. And briefly, the reliance on 25 CFR 292.11 is incorrect for a couple of reasons. One is that the grandfather clause does apply. And the agency is entitled to deference on that point. When the agency originally proposed the 2008 regulations, they were proposed in 2006, there was no grandfather clause. And the public commented and said, well, how does this apply for, you know, applications that are already in progress? And the agency said, yeah, that's a good idea. We'll put in a grandfather clause. The grandfather clause has been applied in a few cases. In 2017, the court upheld Interior's decision that the 2000 regulations did not apply because of the grandfather clause. Plaintiffs don't mention County of Amador, they do point to Butte County. But there, there was no evasion or any suggestion of, you know, anything untoward. In that case, the only issue was the historical connection issue. And on that point, there is no difference between the 2008 regulation and the common law three-factor test. So it simply was not relevant. And we had thought you didn't need to get into this in order to decide the seat if they don't prevail in this court to go on to argue that 292.12 applies and the tribe doesn't satisfy those criteria. We disagree with the arguments that they made in their reply brief about why that regulation isn't satisfied. Of course, you know, the agencies would have to are not persuasive. What about the question of final decision here? If the parties are relying on this Sisseton case, isn't that an outlier in the country as to what's a final decision? And what is the limiting principle on when a decision that remands to an agency is a final decision? Yes, Your Honor, we took a long look at that case in deciding whether we would move to dismiss the appeal for lack of jurisdiction. We ultimately did not file such a motion because we thought that this case did come within the ambit of that case. But you're raising the question whether that case was correct, I think. And I believe the United States position in that case was that there was not appellate jurisdiction. We lost on that point. We are typically supporters of the not be jurisdiction. Having gotten this far, it would be useful to get an interpretation of the restoration act. Well, I know that that's the parties put us in that position. We've done all this work. So you need to kind of overlook the jurisdictional problem, maybe. And that's where we are. You decided not to move to dismiss. Maybe you thought Sisseton was controlling. But I'm wondering what's the limiting principle on that then? Are we going to say every remand is a final decision? Or is there some category of remands that's final and some category that's not? Yeah, Your Honor. Although the court denied 1292B because it was a final judgment, arguably, and the district court decided not to retain jurisdiction, this really is a perfect 1292B question. And so I I understand your concern with the limits here. And we did view it as a difficult question. And we generally do support the remand rule that the pieces should be decided before it comes to the court. Thank you. Thank you, Mr. Lundquist. Thank you, Chief Judge. As I was trying to say, I just want to point out that the Oregon and the state and the federal government do not aggredate the part 292 regulations that brand X agency override. And those regulations that went through that detailed rulemaking process may have determined a different outcome in those particular cases. I would just end with stating that I view this as the agency striving to have it both ways. The ruling allows gaming when their own regulations would not. Now that the state of Nebraska is moving towards casino gaming, how will they treat the trust lands that the tribe holds in Lincoln? The rules apply. It's not in Knox or Boyd County. No gaming allowed. I would ask you to please reverse the finding and determine as a matter of law that the Carter Lake parcel does not qualify under IGRA as gaming eligible restored lands. And thank you for your time today. Thank you, Mr. Lundquist. Thank you also, Ms. Sprigg. We appreciate both counsel's presence before the court this morning and the briefing which you've submitted. We'll take the case under advisement or into decision in due course. Thank you.